**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 9:15-CV-80560-ROSENBERG/BRANNON**

VTS TRANSPORTATION, INC., a
Florida corporation, d/b/a NORTH COUNTY
TRANSPORTATION, GASOLINERA, INC., a
Florida corporation d/b/a APOLLO
TRANSPORTATION SERVICES,
BOYCE TRANS, INC., a Florida corporation
d/b/a A1A AIRPORT and LIMOUSINE SERVICE,
ALL TRANSIT SOLUTIONS, LLC, a Florida
limited liability company, d/b/a METRO PREMIER
CAR SERVICE and PRESTIGE LIMOUSINES, INC.,
a Florida corporation,

       Plaintiffs,

v.

PALM BEACH COUNTY, a political subdivision
of the State of Florida,

       Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

      Now before the Court are cross-motions for summary judgment: Defendant's Motion for

Summary Judgment, DE 350, and Plaintiffs' Motion for Partial Summary Judgment, DE 333.

Plaintiffs have filed a Response in Opposition to Defendant's Motion for Summary Judgment,

DE 359, to which Defendant has filed a Reply, DE 369. Defendant has, likewise, filed a

Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment, DE 361, to which

Plaintiffs have filed a Reply, DE 372. Having considered these filings and the argument heard on

December 6, 2016, the Court grants Defendant's Motion for Summary Judgment and denies

Plaintiffs' Motion for Partial Summary Judgment.

## I.    BACKGROUND

This suit was filed against Defendant Palm Beach County over its decision to enter into a Temporary Operating Agreement ("TOA") with Raiser, LLC ("Raiser), which is a subsidiary of Uber Technologies, Inc. ("Uber"). DE 1. The TOA was a temporary agreement allowing Raiser to operate in Palm Beach County without complying with the ordinance governing vehicle-for-hire services ("old VFH Ordinance"). *Id.* Plaintiffs, three vehicle-for-hire ("VFH") companies operating in the County, challenged the TOA under the Equal Protection Clause of the United States Constitution, arguing that the requirements imposed under the TOA were less onerous than those imposed under the old VFH Ordinance. *Id.* The case is now before the Court on the parties' cross-motions for summary judgment.

## II.    STANDARD OF REVIEW

"[T]he [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal citation omitted). The substance of the relevant law dictates whether a fact is material. *Id.* And a genuine issue of material fact exists only if a reasonable jury could, in view of the evidence, return a verdict in favor of the nonmoving party. *Id.* "The principles governing summary judgment do not change when the parties file cross-motions . . ." *T–Mobile S. LLC v. City of Jacksonville, Fla.*, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). When presented with cross-motions, "the [C]ourt must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." *Id.*

III.    **DISCUSSION**

   a.   **The Reasoning In** *Engquist v. Oregon Department of Agriculture* **Does Not**
        **Compel Summary Judgment For Defendant.**

Defendant makes the threshold argument that Plaintiffs have failed to state a cognizable

class of one claim, citing to *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591

(2008).[1] In *Engquist*, the Supreme Court held that the class of one theory was inapplicable to

decisions made by the government in its role as employer. *Id.* at 606. Defendant's argument

seizes on *dicta* suggesting that the class of one theory is similarly inapplicable to other "forms of

state action . . . which by their nature involve discretionary decision making based on a vast array

of subjective, individualized assessments." *Id.* at 603. The class of one theory, the Supreme

Court reasoned, would be a poor fit for such cases. It stated: "[T]he rule that 'people should be

treated alike, under like circumstances and conditions' is not violated when one person is treated

differently than others, because treating like individuals differently is an accepted consequence

of the discretion granted." *Id.*

Defendants urge the Court to apply *Engquist*'s reasoning outside of the public

employment context and to hold that because Plaintiffs' claim "is premised entirely on the

County's discretionary decision on how to enforce its laws," the class of one theory is

---

[1] Defendant also argues that the class of one theory is unavailable to Plaintiffs, citing to *Misfud v. Uber Technologies, Inc.*, No. 16-10049, 2016 WL 4415254 (E.D. Mich. Aug. 19, 2016). In *Misfud*, the district court held that the class of one theory was not available, *id.* at *4, to a plaintiff alleging that defendant's failure to require Uber drivers to adhere to the Limousine Act and select provisions of the Michigan Vehicle Code constituted a class of one equal protection violation, *id.* at *1. The district court reasoned that plaintiff's allegations could not support a class of one claim because plaintiff had alleged only that it was being treated like all other for-hire limousine drivers in the state and that Uber was being singled out for preferential treatment. *Id.* at *4. Here, Plaintiff made the same argument in its Motion for Reconsideration. It was rejected by the Court in the Order Denying Defendant's Motion for Reconsideration for reasons equally relevant at the summary judgment stage. DE 346.

unavailable. DE 350 at 14. The Court declines to do so. The Court has located only one published decision in which the Eleventh Circuit has applied *Engquist*'s reasoning outside of the public employment context: *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269 (11th Cir. 2008).[2] In *Douglas* the Eleventh Circuit held that the reasoning in *Engquist* was equally applicable to the government-employee relationship and to the analogous government-contractor relationship. *Id.* at 1274. The Eleventh Circuit had "little trouble" so concluding given the Supreme Court's acknowledgement of "obvious" similarities between the government-employee relationship and the government-contractor relationship in deciding whether an independent contractor may bring a retaliation claim under § 1983 when a government entity has acted against the contractor's exercise of free speech. *Id.* (citing *Bd. of Cty Commissioners v. Umbehr*, 518 U.S. 668 (1996)).

There is no similarly obvious connection between *Engquist* and the facts of the instant case. Indeed, as the Supreme Court recognized in *Engquist*, there is a "crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operations." *Engquist*, 553 U.S. at 598 (citations, quotations and brackets omitted). Here, Defendant—a government entity—was making a decision as to how Raiser ought to be regulated, an exercise of its power as lawmaker. The Court, therefore, declines to hold that the class of one theory is unavailable to Plaintiffs. Defendant is not entitled to summary judgment in light of *Engquist*.

---

[2] The Court has not located any published decision in which a district court in this Circuit has applied *Engquist*'s reasoning beyond the application identified by the Eleventh Circuit in *Douglas Asphalt*.

### b. Defendant Is Entitled To Summary Judgment On Plaintiffs' Equal Protection Clause Claim.

The Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. A class of one equal protection claim does not allege discrimination against a protected class or on the basis that a fundamental right was infringed. *See Leib v. Hillsborough Cnty Public Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). To prevail on a class of one equal protection claim, Plaintiffs must show that they were treated differently from other similarly situated individuals absent a rational basis for the differential treatment. *Grider v. City of Auburn, Ala.,* 618 F.3d 1240, 1263–1264 (11th Cir. 2010). Defendant argues that it is entitled to summary judgment both because the parties are not similarly situated and because there was a rational basis for the TOA's enactment. Plaintiffs' cross-motion argues, conversely, that the parties are similarly situated and that there was no rational basis for the TOA's enactment. The Court's holding that Defendant is entitled to summary judgment is grounded solely on the conclusion that Defendant has presented a rational basis for the TOA. The Court need not address whether the parties are similarly situated.

### i. The Existence Of A Rational Basis For The TOA.

"When legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends on the basis for the classification." *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1337 (11th Cir. 2002).[3] If a

---

[3] Plaintiffs argue that cases applying rational basis review when analyzing legislation or regulations that imposed differential classifications are inapposite because the TOA was a contract. DE 372 at 5-7. However, the TOA, which exempted Raiser from standards set forth in the Palm Beach County Code and set forth a distinct regulatory scheme, was entered into only upon a vote by the Board of County Commissioners. DE 137 at 7, ¶ 38. Moreover, other courts have applied rational basis review in similar cases. *See Newark Cab Ass'n et al. v. City of*

law treats individuals differently on the basis of a suspect classification or impinges on a fundamental right, strict scrutiny applies. *Leib*, 558 F.3d at 1306. Otherwise, the law need only be rationally related to a legitimate government purpose. *Id.* Because Plaintiffs allege neither membership in a suspect class nor violation of a fundamental right, their claim is subject to rational basis review.

The rational-basis standard requires only that the challenged classification be rationally related to some legitimate government purpose. *Haves v. City of Miami*, 52 F.3d 918, 922 (11th Cir. 1995). The inquiry has two steps. *Id*. First, the Court must identify a legitimate government purpose that the enacting body could have been pursuing. *Id.* Second, the Court must question the existence of a rational basis for the belief that the challenged enactment would further that legitimate government purpose. *Id.* The challenged enactment will fail rational basis review only if the Court cannot identify a potential legitimate government purpose or if the relationship between that purpose and the challenged enactment is so attenuated as to be "arbitrary and irrational." *Id.* "In sum, those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Id.* (internal quotations and citations omitted). Defendants have put forward several rational bases for the TOA; the Court will address two of them: capturing new technology and facilitating competition. *See* DE 361 at 10 (listing rational bases). Together, these rational bases account for the distinctions between the TOA and the old VFH ordinance.

---

*Newark*, Case No. 16-cv-4681 (D. N.J. Jan. 17, 2017) (applying rational basis review when assessing the City of Newark's decision to enter in the Uber-Newark Agreement, a contract that imposed a "modified regulatory regime" on Uber).

### 1.  <u>Capturing New Technology.</u>

The Court agrees that crafting a framework to capture new technology is a legitimate government purpose. The TOA serves that purpose by accounting for Raiser's digital platform—a feature with which, Defendant argues, the old VFH Ordinance conflicted. The old VFH Ordinance included a "prearrangement requirement" mandating that non-taxi rides be gotten through "a written, e-mail, fax or telephone reservation made at least thirty (30) minutes in advance . . ."  DE 351-3, Ex. 1 at 3. Defendant contends that the prearrangement requirement conflicted with Raiser's business model for two reasons. DE 350 at 20. First, because the exclusive use of a digital platform to request a ride is not captured by the phrase "written, e-mail, or telephone reservation." DE 351-3 ¶ 25. And, second, because Raiser's aim—namely, providing rides within "five, ten, or fifteen minutes of when the ride was requested" by matching passengers with the nearest Raiser driver exclusively through its digital platform—would be thwarted were Raiser required to abide the thirty minute advance requirement. *Id.*

At oral argument, Plaintiffs asserted that the purported conflict between Raiser's digital platform and the old VFH Ordinance was illusory. The old VFH Ordinance provides: "The thirty minute advance requirement does not apply to companies with authorized vehicle for hire contracts with Palm Beach International Airport and other businesses that provide vehicle for hire services by contract." DE 351-3, Ex. 1 at 3. Plaintiffs argue that this language exempted Raiser from the prearrangement requirement because Raiser has written contracts with its customers. Plaintiffs also argue that the use of a digital platform on a cellular telephone was encompassed within the meaning of "telephone reservation."

However, Defendant *could*, acting rationally, have construed the exemption as inapposite. Specifically, Defendant could have read the exemption from the prearrangement requirement as

applying only to companies with authorized vehicle for hire contracts with the Palm Beach International Airport or with businesses similar to the Airport. And Defendant *could*, acting rationally, have construed the term "telephone reservation" as encompassing telephone calls, but not a digital platform accessed through a smart phone.

Indeed, the content of the TOA and the new VFH ordinance reflect that Defendant adopted both positions. The TOA reads as a stop-gap measure meant to allow Raiser to continue operating while Defendant "review[ed] its VFH regulations as they pertain specifically to TNCs." DE 351-1 at 2. Moreover, unlike the old VFH ordinance, the TOA did not contain any prearrangement requirement. *See id.* And the definition of "prearranged" under the new VFH Ordinance includes "any reservation made in advance by the person requesting service from any telephone, internet-enabled platform, program, or software, including a smartphone or tablet application or website." DE 181-1 at 90. Moreover, there is no thirty minute advance requirement under the new VFH Ordinance. *Id.* This evolution affirms the existence of a rational basis for the belief that enacting the TOA was a logical step toward furthering the legitimate government purpose of crafting a framework to capture new technology.

Plaintiffs' primary counterargument is that, because it does not justify the County's decision to exclude other requirements from the TOA (*e.g.* insurance, background checks, vehicle inspections, etc.), the existence of a rational basis for the prearrangement requirement is insufficient to justify granting summary judgment for Defendant. However, the next rational basis—facilitating competition—accounts for the remaining differences between the old VFH Ordinance and the TOA.

## 2.  **Facilitating Competition.**

Defendant cites facilitating competition as an additional rational basis for the TOA. The Court agrees that facilitating competition is a legitimate government purpose. *See Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 599 (7th Cir. 2016) ("Chicago, . . . , has chosen the side of deregulation, and thus of competition, over preserving the traditional taxicab monopolies. That is a legally permissible choice."). The question, therefore, is whether there was a rational basis for the belief that enacting the TOA would further that legitimate government purpose. Plaintiffs respond that there  was not because "[t]he TOA [did] not unlock a previously closed market . . . Instead, it grant[ed] preference to a company that is perfectly capable of operating under current regulation, but is just unwilling to do so." DE 333 at 13. But, to borrow from Judge Posner, Plaintiffs' premise "that every new entrant into a market should be forced to comply with every regulation applicable to incumbents in the market with whom the new entrant will be competing" is incorrect. *Ill. Transp.*, 839 F.3d at 597. The issue is not the existence of different regulatory schemes; rather, it is whether the differences between the regulatory schemes applied to Raiser and Plaintiffs—the TOA and the old VFH Ordinance, respectively—are defensible or arbitrary.

The Court agrees with Defendant that the differences between the two regulatory schemes are defensible. As the discussion below illustrates, the differences between the TOA and the old VFH ordinance are keyed to differences between Raiser and Plaintiffs. The connection between the provisions of the TOA and unique aspects of Raiser's business evidences a connection between Defendant's proffered rational basis—facilitating competition—and the TOA. By accommodating unique aspects of Raiser's business, the TOA promoted competition. In support of its conclusion the Court will now address, in turn, each of the differences between

the TOA and the old VFH ordinance for which, Plaintiffs argue, no rational basis exists, showing that each is keyed to a distinction between Plaintiffs' businesses and Raiser's business. *See* DE 137 at 10-17, ¶¶ (a)-(aa) (outlining the differences).

Plaintiffs object that the TOA, unlike the old VFH ordinance, does not require that Raiser drivers speak and understand English or submit to examinations designed to test their knowledge of English and Palm Beach County geography. DE 137 at 16, ¶¶ (z)-(aa) (citing Palm Beach County Code §§ 19-227(n) and 19-227(o)). But Raiser, unlike Plaintiffs' businesses, operates *exclusively* through a digital platform.  DE 351-1 at 6, ¶ II(K). The digital platform eliminates the need for a demonstrated knowledge of Palm Beach County geography. The origin and destination are pre-programmed into the digital platform, which provides real-time GPS navigation. The digital platform also eliminates the need for discussion. It not only handles navigation, but provides a price estimate and facilitates payment at the trip's end. *Id.* Plaintiffs argue that these features do not meaningfully distinguish Raiser for two reasons: First, because the central dispatcher utilized by Plaintiffs similarly eliminates the need for discussion between driver and passenger by conveying a price estimate to the passenger and an origin and destination to the driver. DE 359 at 15. And, second, because "each of the Plaintiffs use GPS for route finding." *Id.*  Both arguments are unpersuasive. Even after communicating with the central dispatcher, the passenger still must pay, which often requires verbal communication about the proper amount of change or how to use the card-reader. And although "each of the Plaintiffs use GPS for route finding," Plaintiffs have presented no evidence that they are *required* to do so. Raiser drivers can operate *only* through the digital platform. DE 351-1 at 6, ¶ II(K).

Next, Plaintiffs object that Raiser drivers, unlike Plaintiffs, are not required to wear a collared shirt, long pants or a knee length skirt, and closed shoes. DE 137 at 16, ¶ (y) (citing

Palm Beach County Code § 19-227(k)). But, as noted above, Raiser operates *exclusively* through a digital platform. DE 351-1 at 6, ¶ II(K). That digital platform allows each passenger to rate his or her driver immediately after each ride. DE 351-2 at 3, ¶ 10. It is neither arbitrary nor irrational to conclude that this ratings system would, by enabling the efficient communication of any concerns, render a uniform requirement unnecessary by encouraging professional dress.

Plaintiffs also complain that the TOA does not restrict Raiser drivers from driving for more than twelve hours during any one twenty-four hour period as supported by a vehicle trip manifest. DE 137 at 15, ¶ (x). According to Defendant, the fact that most Raiser drivers work part-time[4] provides a rational basis for excluding the twelve hour limit from the TOA. Plaintiffs respond that "if [Raiser] drivers are merely part-time, there would never be any reason that they would need to drive more than twelve hours in a twenty-four hour period." DE 359 at 15.[5] That is precisely Defendant's point: the absence of a reason why Raiser's primarily part-time employees would drive more than twelve hours in a twenty-four hour period provides a reason for omitting that restriction from the TOA. It is not necessary to analyze the trip manifest requirement separately—in the absence of the twelve hour limit, there is no need for the preparation and maintenance of vehicle trip manifests designed to demonstrate compliance with that limit.

---

[4] DE 149, 94: 11-20 ("Over 70 percent of our driver partners here in Palm Beach County are part-time driver partners that do this for supplemental income"); DE 351, Ex. 23, 21: 1-17 ("[S]ixty to seventy percent of drivers that use ride sharing services do it on a part-time basis, less than twenty hours a week . . .").

[5] Plaintiffs emphasize that Defendant has "submitted no evidence" that Raiser drivers are *only* part time drivers. DE 359 at 12 (emphasis added). That is true. However, Defendant has submitted evidence that Raiser drivers are *primarily* part time drivers. Evidence that Raiser's unique business model attracts a primarily part-time work force is sufficient to support the decision not to impose a twelve hour limit on Raiser.

The old VFH ordinance required Plaintiffs to maintain a commercial business office or residential home office in Palm Beach County. DE 137 at 11, ¶ (g) (citing Palm Beach County Code § 19-218(h)). Plaintiffs object that this same requirement ought to have been imposed on Raiser. The definitions of commercial business office and residential business office, however, illustrate that these locations were intended to serve as dispatch centers. A commercial business office must, among other requirements, have central dispatch and a dedicated wired phone line. Palm Beach County Code § 19-213. Similarly, any residential home office must have a separate wired telephone line. *Id.* Raiser's digital platform eliminates the need for central dispatch by pairing drivers with passengers and transmitting pick-up and drop-off locations.

Plaintiffs object that Raiser drivers are not required to obtain VFH driver IDs before operating in Palm Beach County. DE 137 at 10, ¶ (a) (citing Palm Beach County Code § 19-214(a)); DE 137 at 11, ¶ (f) (citing Palm Beach County Code § 19-218(f)). Contained within the ambit of that protestation are more focused complaints about aspects of the VFH driver ID application process to which Raiser drivers are not subjected. *See* DE 137 at 14, ¶ (q)-(u). For example, applicants for VFH driver IDs are required to submit to photographing. DE 137 at 14, ¶ (t) (citing Palm Beach County Code § 19-227 (a)(17)). And, upon issuance, each VFH driver ID must be placed on "conspicuous display" for public inspection. *Id.* at 15, ¶ (u) (citing Palm Beach County Code § 19-227(b)). These requirements would be duplicative in light of Raiser's digital platform. As memorialized in the TOA's "Driver/Vehicle Identification Requirement" section, Raiser's digital platform displays for the passenger the "name and photograph" of the Raiser driver with whom he or she has matched, among other information. DE 351-1 at 35, ¶ II(F). In short: A photograph must be submitted for display through the digital platform.

Relatedly, the background and driving checks to which Raiser drivers are subjected are, according to Plaintiffs, less stringent than those built into the process of obtaining a VFH driver ID. The Court will begin with the background check requirements. The old VFH ordinance required each VFH driver to "provide the original request form for his/her Florida Department of Law enforcement criminal history/records report to the Division" along with payment. Palm Beach County Code § 19-227(a)(6). The Division would then "notify each applicant to be fingerprinted that his or her fingerprints will be sent to the State Department of Law Enforcement for a state criminal history record check and to the Federal Bureau of Investigation for a national criminal history record check." *Id.* The TOA does not provide for a mandatory fingerprint background check run through the Division.

When the issue was raised, Raiser presented evidence that its primarily part time drivers would be unwilling to submit to level II background checks. DE 351-15 at 116: 6-23. A reduction in Raiser's pool of drivers would hinder its ability to compete by increasing wait times and decreasing safety and convenience. *Id.*  From this evidence, one can extrapolate that tailoring the background check requirements in the TOA was a rational step toward the legitimate government purpose of facilitating competition. And there are still meaningful safeguards. The TOA provides: "Raiser shall conduct a local, state and federal criminal background check and obtain and review the criminal history for each potential Raiser partner." DE 351-1 at 4, ¶ II(B). It further instructs that a given individual "shall not be permitted to be a Raiser partner if he or she has committed any of a series of enumerated crimes identical to those screened for under the old VFH ordinance. *Id.* Raiser coupled its showing that the existing background check requirements would deter drivers with evidence about the safety and effectiveness of its

background checks.[6] DE 147 at 92-97: 24-17. Moreover, Raiser produced evidence that its business model incorporates unique safety features, including the "Share my ETA" feature allowing riders to share their location and estimated time of arrival. *See* DE 312-1 at 3, ¶ 10 (discussing this safety feature and others).

The TOA requires that Raiser check the driving histories of its drivers. DE 137 at 4, ¶¶ II(B)-(C). And Raiser does so. But Plaintiffs argue that the driving history check imposed on Raiser drivers is less burdensome. The Code requires each VFH driver to demonstrate eligibility to drive within the county by showing that he or she possesses a valid Florida driver's license. DE 137 at 13, ¶ (p) (citing Palm Beach County Code § 19-227(a)(2)). Each VFH drivers must also show that he or she has possessed a valid driver's license issued by any U.S. state for at least three years, or, if he or she has not, that he or she sign  an affidavit attesting that there are no impediments to his or her operating a vehicle within the county. *Id.* Raiser drivers, on the other hand, are required to have a Florida valid driver's license or to be "otherwise authorized to operate a motor vehicle pursuant to Section 322.031, Florida Statutes." DE 351-1 at 4-5, ¶ II(D). The Code also requires that VFH drivers submit an original form of his or her lifetime state department of highway safety and motor vehicles driving record report secured no more than thirty days before the application's submission. *Id.* at 14, ¶ (q) (citing Palm Beach County Code § 19-227(a)(3)). Upon initial application, any driver that has resided in Florida for less than five consecutive years must submit a driving history from each previous state where he or she resided going back five years. *Id.* These specific requirements are not imposed on Raiser. The possibility

---

[6] Relatedly, unlike drivers with current VFH driver ID badges, Raiser drivers are not required to notify the Division within ten days of being convicted of any crime. DE 137 at 14, ¶ (s)(citing Palm Beach County Code § 19-227(a)(14).The same arguments above about the potential impact on Raiser's driver pool provide a conceivable rational basis for omitting this requirement, too, from the TOA.

that Raiser's primarily part time workforce would have been deterred were it required to satisfy these more stringent requirements provides a rational basis for the belief that omitting these requirements would further the legitimate government purpose of facilitating competition.

Plaintiffs also object to several of the insurance requirements under the TOA. First, the TOA reduced the amount of insurance Raiser drivers are required to carry when they are logged into the digital platform, but are neither en route to pick up a passenger nor transporting a passenger.[7] Defendant responds that this is a rational alteration. Because most Raiser drivers work part-time it would be wasteful to require the same insurance limits whether those Raiser drivers were working or not. DE 149, 94: 11-20 ("Over 70 percent of our driver partners here in Palm Beach County are part-time driver partners that do this for supplemental income"); DE 351, Ex. 23, 21: 1-17 ("[S]ixty to seventy percent of drivers that use ride sharing services do it on a part-time basis, less than twenty hours a week . . ."). Plaintiffs respond that although "there is certainly a rational reason to create a different type of insurance requirement for part-time drivers who use personal automobiles, there is no rational reason to do that only for Uber . . ." DE 359 at 13. This argument overlooks the fact that the TOA was created to suit a business model which, by virtue of its unique digital platform, attracts primarily part-time employees. It is a sensible conclusion that providing around-the-clock commercial insurance for a primarily part-time workforce would impose an unnecessary financial burden on Raiser. Plaintiffs also contest the fact that Raiser is not required to carry an insurance policy issued by an insurance company

---

[7] At such times, Raiser drivers must carry "at least fifty thousand dollars ($50,000) for bodily injury in  any one (1) person in any one (1) accident, one hundred thousand dollars ($100,000) for bodily injury to all persons in any one (1) accident, and twenty-five thousand dollars ($25,000) for property damage in any one (1) accident . . ." DE 137 at 33, ¶ II(A)(1)(a). By contrast, Raiser drivers must have "primary commercial automobile liability insurance of at least $1,000,000 for death, personal injury, and property damage" when en route to pick up a passenger or when transporting a passenger. *Id.* at 33, ¶ II(A)(2)(b).

"licensed and admitted to write commercial automobile liability insurance in Florida." DE 137 at 13, ¶ (o). However, it is, again, sensible to conclude that a market entrant with a distinguishable business model might require a different insurer.

Relatedly, the old VFH ordinance required each applicant for a VFH driver ID to submit a notarized affidavit signed by each VFH company for which he or she drives, stating that he or she is eligible to be insured. DE 137 at 15, ¶ (v) (citing Palm Beach County Code § 19-227(c)). A separate section required an affidavit attesting that each driver was eligible to be insured by the VFH company's commercial automobile liability insurer and was, in fact, insured. DE 137 at 12, ¶ (h)(citing Palm Beach County Code § 19-218(i)). It was neither arbitrary nor irrational to conclude that the affidavits are duplicative of the requirement that Raiser "shall provide blanket coverage for non-owned vehicles active on the Raiser platform." DE 351-1 at 4, ¶ II(A)(5).

Finally, Plaintiffs object to the vehicle inspection requirements imposed under the TOA. Under the old VFH ordinance, bi-annual inspections are required if a vehicle is over seven years old or has more than 500,000 miles. DE 137 at 12, ¶ (i) (citing Palm Beach County Code § 19-220(a)).[8] Most Raiser drivers, however, use personal vehicles. Defendants argue that because personal vehicles are typically newer, a rational basis exists for omitting the bi-annual inspection requirement from the TOA.  The Court agrees. Next, Plaintiffs argue that Raiser drivers are exempted from "various requirements regarding vehicle safety and appearance" and that "the TOA does not impose any such requirements on Raiser." DE 137 at 12, ¶ (k) (citing Palm Beach County Code § 19-223). However, the TOA requires each Raiser driver's vehicle to be put through a nineteen-point inspection by an automobile technician certified by the National Institute for Automotive Service Excellence (ASE). This inspection addresses many of the

---

[8] The Complaint states that the limit was 350,000 miles. This appears to have been a typographical error.

components which, Plaintiffs allege, Raiser drivers have been exempted from having inspected.[9]

True, the old VFH ordinance is more detailed as regards the required condition of these

components; however, the requirements therein go to basic functionality and would doubtless be

a part of any competent inspection. The Court finds that a conceivable rational basis exists for

excluding the remaining requirements. For example, the old VFH ordinance requires certification

that the "floor board shall be free of rust and holes" and that the "interior must be free of

offensive odors." Palm Beach County Code § 19-223(b). The Court finds that the likelihood that

a personal vehicle would be newer provides a rational basis for exempting Raiser from an

inspection that includes these requirements. So does Raiser's unique ratings system, which

would reinforce the importance of these requirements being satisfied.[10] Other requirements, like

the requirement that each driver have means of communicating with a central dispatch are

rendered duplicative by Raiser's digital platform. Palm Beach County Code § 19-223(x).[11]

---

[9] The following is a list of the components that must be inspected under the TOA and an accompanying citation to the portion of the old VFH ordinance that requires an inspection of those same components: (1) Foot brakes, addressed at § 223(q); (2) Emergency parking brake, addressed at § 223(q); (3) Suspension/steering mechanism, addressed at §§ 223 (n)-(o); (4) Windshield, addressed at § 223 (a); (5) Rear window and other glass, addressed at § 223 (a); (6) Windshield wipers, addressed at § 223 (k); (7) Headlights, addressed at § 223 (m); (8) Taillights, addressed at § 223 (m); (9) Turn indicator lights, addressed at § 223 (m); (10) Brake lights, addressed at § 223 (m); (11) Front seat adjustment mechanism, addressed at § 223 (b) as part of "interior equipment"; (12) Doors, addressed at § 223 (c); (13) Horn, addressed at § 223 (p); (14) Speedometer, addressed at § 223 (v); (15) Bumpers, addressed at § 223 (i); (16) Muffler and exhaust system, addressed at § 223 (r); (17) Condition of tires, addressed at § 223 (j); (19) Safety belts for drivers and passengers, addressed at § 223 (d).

[10] The same rationale applies to the requirements related to interior lights, heating and air conditioning, and overall appearance, as well as the requirement that drivers carry a spare tire, take their automobiles for routine maintenance, and maintain appropriate fluid levels in their vehicles. Palm Beach County Code § 19-223 (e),(f),(i),(t),(u),(w).

[11] Plaintiffs also object  that the TOA does not require that inspections be conducted by an ASE certified automobile technician utilizing a three part inspection form. DE 137 at 12, ¶ (l). But the existence of a rational basis for not requiring an inspection of some components addressed in the old VFH ordinance means, relatedly, the existence of a rational basis for not requiring an

Plaintiffs are required to obtain a vehicle decal under the old VFH ordinance. The TOA does not impose that requirement. Plaintiffs object to this distinction. DE 137 at 11, ¶ (d)(citing Palm Beach County Code § 19-215(a); *id.* at 12, ¶ (j) (citing Palm Beach County Code § 19-221(a)-(k)). However, the difference goes directly to Raiser's unique business model. Raiser passengers watch their vehicle track toward them once a match is made on a screen that also displays the vehicle's make, model, and license plate number. This eliminates doubt about whether a given vehicle is the one sent to retrieve a certain passenger. And the vehicle's registration with the digital platform eliminates doubt as to whether it is a Raiser partner vehicle operating in accord with the TOA. No visible decal is needed to make that showing.[12]

Additionally, while the old VFH ordinance required Plaintiffs to obtain a business permit, the TOA does not. Plaintiffs object to this distinction in several portions of the Amended Complaint. *See* DE 137 at 10, ¶ (a)(citing Palm Beach County Code § 19-214(a)); *id.* at 11, ¶ (f) (citing Palm Beach County Code § 19-218(b)); *id.* at 11, ¶ (g) (citing Palm Beach County Code § 19-218(h)).   Defendant argues that compliance with the TOA is the functional equivalent of obtaining a business permit. Reviewing the components of a business permit application reveals that only those requirements inapplicable in light of Uber's business model are not otherwise addressed by the TOA. The existence of inapplicable components provides a rational basis for exempting Raiser. For example, the business permit application requires submission of a "local or Florida business address," but, as addressed above, a rational basis existed for exempting

---

identical inspection form. As noted above, the TOA—like the old VFH ordinance—requires that mechanics be ASE certified.

[12] Relatedly, Plaintiffs object that Raiser is not subject to the advertising restrictions imposed under the old VFH ordinance. DE 137 at 11, ¶ (d)(citing Palm Beach County Code § 19-215(a)). But this advertising requirement revolves around requirements from which this Order concludes there was a rational basis to exempt Raiser—the requirement of obtaining a vehicle decal and business permit and the requirement that the business have a physical address, for example. Therefore, a rational basis exists for declining to include these requirements in the TOA.

Raiser from this requirement. Palm Beach County Code § 19-218(2). Business permit applicants are also required to file each "vehicle for hire driver's ID badge number"—however, as addressed above and in this section, a rational basis existed for exempting Raiser from the VFH driver ID requirement. *Id.* at § 19-218(10).

The analysis above demonstrates that the distinctions between the TOA and the old VFH ordinance were keyed to distinctions between Plaintiffs' businesses and Raiser's business. That correlation provides a rational basis for the belief that enacting the TOA would further the legitimate government purpose of facilitating competition. The existence of that rational basis dissolves Plaintiffs' equal protection claim.

**c.   Developments Regarding Dismissal For Failure To State A Claim.**

Defendant previously moved for the Court to reconsider its earlier denial of Defendant's Motion to Dismiss. DE 291. The Motion for Reconsideration was grounded, in part, in the Seventh Circuit's decision in *Illinois Transportation Trade Association v. City of Chicago*, 134 F. Supp. 3d 1108, 1110 (N.D. Ill. 2015). Defendant argued that "[b]ecause the Uber business model and technology in *Illinois Transportation* is virtually identical to the Uber business model and technology in the instant case, a point which Plaintiffs did not and could not dispute," the Court needed to find that "Plaintiffs in the instant case are not, as a matter of law, similarly situated in all relevant respects to Raiser for purposes of establishing an equal protection claim." DE 295 at 4. The Court rejected the position that Plaintiffs and Raiser were not similarly situated as a matter of law and, accordingly, issued the Order Denying Defendant's Motion to Reconsider on November 2, 2016. DE 346. Defendant also argued that the Court should find, in light of the analysis in *Illinois Transportation*, that a rational basis existed for the TOA. The Court declined to credit that argument, holding that the existence of a rational basis remained a "factual issue

which would 'be better addressed in a motion for summary judgment . . .'" DE 346 at 6 (quoting DE 136 at 5 n. 2).

However, since the Court issued its Order Denying Defendant's Motion to Reconsider, the legal landscape has evolved. Other federal district courts have cited to *Illinois Transportation* for the conclusion that the differences between Uber and companies like Plaintiffs provide a rational basis for treating the two differently—a rational basis sufficient to dissolve an equal protection claim. These district courts have dismissed similar cases at the motion to dismiss or judgment on the pleadings stages. *See Desoto Cab Co. v. Michael Picker, et al.*, Case No. 15-cv-04375, at 12 (N.D. Cal. Jan. 12, 2017) (assuming *arguendo* at judgment on the pleadings stage that the parties were similarly situated and concluding that a rational basis for differential treatment existed); *Boston Taxi Owners Ass'n Inc. v. Governor Charles Baker, et al.*, Case No. 16-cv-11922, at 13 (N.D. Mass. Jan. 24, 2017) (assuming *arguendo* at the motion to dismiss stage that the parties were similarly situated and concluding that a rational basis for differential treatment existed). The Court notes that these cases had not been yet been decided when the Court addressed Defendant's Motion to Reconsider. Rather, the cases noted above were decided only after the motions at the summary judgment stage had been fully briefed, providing the Court with a developed factual record.

## IV.   CONCLUSION

Because Defendant has demonstrated the existence of a rational basis for the TOA, its

Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Partial Summary Judgment

is DENIED. The Clerk of Court is directed to CLOSE THIS CASE. All pending motions are

DENIED AS MOOT, all hearings CANCELLED, and all deadlines TERMINATED.

**DONE and ORDERED** in Chambers at West Palm Beach in the Southern District of

Florida, this 8th day of March, 2017.

Copies furnished to:                                    ROBIN L. ROSENBERG
Counsel of Record                                     UNITED STATES DISTRICT JUDGE